Jeffrey D. Kaliel (SBN 238293)
*jkaliel@kalielpllc.com*
Sophia Goren Gold (SBN 307971)
*sgold@kalielgold.com*
**KALIELGOLD PLLC**
1100 15the Street NW, 4th Floor
Washington, D.C.  20005
Tel: (202) 350-4783

Scott Edelsberg (330090)
*scott@edelsberglaw.com*
**EDELSBERG LAW, P.A.**
1925 Century Park East, Suite 1700
Los Angeles, CA  90067
Telephone: (305) 975-3320

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARLENE SANCHEZ, individually, and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | **[DEMAND FOR JURY TRIAL]** |
| NAVY FEDERAL CREDIT UNION, | |
| Defendant. | |

1  Plaintiff SHARLENE SANCHEZ ("Plaintiff") brings this complaint, by and
2  through her attorneys and on behalf of all others similarly situated, against Defendant
3  Navy Federal Credit Union ("Navy Federal," or "Defendant") and alleges upon
4  information and belief as follows:

5  ### INTRODUCTION

6  1.    The Zelle money transfer system is rife with fraud—fraud that places all Zelle
7  users at an acute and immediate risk. Billions of dollars of fraudulent transactions are
8  processed by the service each year. Victims of Zelle fraud, like Plaintiff, are often left
9  devastated by such fraud, which can drain hundreds or thousands of dollars from their
10  bank accounts.

11  2.    But Navy Federal was eager to encourage its accountholders to sign up for and
12  use the new Zelle payment service, which allowed consumers to make Navy Federal
13  debit card transactions via Zelle. Aware that consumers like Plaintiff would be hesitant
14  to adopt a new payment methodology without assurances that the methodology could
15  be trusted, Navy Federal and Zelle marketed Zelle as trustworthy ("backed by the
16  banks" and "safe") and made express contract promises that accountholders using Zelle
17  would have "Zero Fraud Liability" and all the same protections as exist for disputed
18  debit card transactions.

19  3.    Navy Federal reneged on these promises.

20  4.    Having lured Navy Federal accountholders to sign up for and use the Zelle
21  service with deceptive and incomplete marketing and contract promises, the Credit
22  Union has failed victims of Zelle fraud. When such victims make a claim for Zelle
23  fraud, Navy Federal denies the claim immediately without conducting a full and
24  reasonable investigation and often times without even offering access to the same
25  provisional credit and dispute resolution process applicable to all other debit card
26  transactions. As occurred with Plaintiff, Navy Federal summarily rejects fraud claims
27  without explanation or recourse.

28

5.     These policies and practices contradict Navy Federal's marketing promises, contract promises, and duty of care owed.

6.     These policies and practices also violate the Electronic Fund Transfer Act ("EFTA") a statute with the purpose of "provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id*. § 1693(b). "The primary objective of [the EFTA] is the provision of individual consumer rights." *Id*.

7.     Plaintiff and the Class members have been injured by signing up for and using Zelle. Plaintiff brings this action on behalf of herself, and the putative Classes, because Plaintiff should not be left "holding the bag" for fraudulent transactions.

8.     Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent Navy Federal from continuing to engage in its illegal practices as described herein.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a different State than Navy Federal. The number of members of the proposed Classes in aggregate exceeds 100 users. 28 U.S.C. § 1332(d)(5)(B).

10.    This Court has personal jurisdiction over the Navy Federal because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Navy Federal is deemed to reside in any judicial district in which they are subject to personal jurisdiction and  substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

12.     Plaintiff Sharlene Sanchez is, and at all times mentioned herein a natural person, individual citizen and resident of Murrieta,  California.

13.     Defendant Navy Federal Credit Union is and was, at all relevant times to this lawsuit, a nationally-chartered credit union with its principal place of business in Vienna, Virginia. Navy Federal operates banking centers and conducts business throughout the State of California.

## ZELLE – THE FAVORITE APP OF FRAUDSTERS AND A MONEYMAKER FOR THE CREDIT UNION

14.     Created in 2017 by America's largest banks[1] to enable digital money transfers, Zelle comes embedded in banking apps and is now America's most widely used money transfer service, outpacing its closest rival (Venmo) by $260 billion in transfers in 2021.[2]

15.     About 1.8 billion payments — totaling $490 billion — were sent by consumers and businesses through the Zelle Network in 2021, according to the Early Warning Services. Total dollars transferred were up 59% from 2020.

16.     Nearly 18 million people have been hit by "widespread fraud" on money transfer apps, according to a letter sent in late April to Zelle's network operator Early Warning Services by U.S. Sens. Elizabeth Warren of Massachusetts, Robert Menendez of New Jersey, and Jack Reed of Rhode Island.[3]

17.     "Zelle's biggest draw — the immediacy of its transfers — also makes scams more effective and 'a favorite of fraudsters,' as consumers have no option to cancel a transaction even moments after authorizing it," the letter stated.

---

[1] Bank of America, Capital One, JPMorgan Chase, PNC, BB&T (now Truist), U.S. Bank and Wells Fargo.

[2] *Fraud is Flourishing on Zelle. The Banks Say It's Not Their Problem*, The New York Times (March 6, 2022) https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html   (last visited September 6, 2022).

[3] Letter from Elizabeth Warren, Robert Menendez, Jack Reed, Sen., U.S. Cong., to Al Ko, CEO, Early Warning Services (April 2, 2022).

18.    The 1,700 banks and credit unions who are members of the Zelle network, including Navy Federal, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take steps to warn their accountholders of these risks—or protect their accountholders who fall prey to fraud.

19.    The rampant fraud on Zelle is only escalating, according to an October 2022 senate report. Data provided by several banks revealed the rapidly increasing extent of fraud on the platform. The four banks that reported the relevant data received scam and fraud claims in excess of $90 million in 2020, and are on pace to receive scam and fraud claims in excess of $255 million in 2022.[4]

20.    In short, and unbeknownst to average Zelle users, but fully known to Navy Federal, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies—or simply for those who steal phones and computers and use their access to drain money from accounts via Zelle.

21.    As one U.S. Senator said to CEOs of some of the banks that own Zelle: "Zelle is not safe. You built the system, you profit from every transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem," said Senator Elizabeth Warren, during a Senate Banking Committee hearing in September 2023.

22.    Fraudsters and scammers have turned to Zelle as their favorite service. The service seems designed precisely to meet their fraudulent needs, since transfers are immediate and unrecoverable. There is an additional design feature of Zelle that makes it a fraudster's favorite: one can become a Zelle user and recipient *without revealing their true identity*.

23.    Led by Idaho Attorney General Lawrence Wasden and Oregon Attorney General Ellen Rosenblum, a bipartisan coalition of thirty-three (33) attorneys general wrote the

---

[4] "Facilitating Fraud: How Consumers Defrauded on Zelle are Left High and Dry by the Banks that Created It," Office of Sen. Elizabeth Warren.

Consumer Financial Consumer Protection Bureau ("CFPB"), calling for stronger consumer safeguards for money sharing platforms and apps like Zelle. The letter, written in response to the CFPB's request for comments on its inquiry into "Big Tech Payment Platforms," noted a rise in complaints against popular payment apps including Zelle. The letter highlighted that: "[m]any consumers have been scammed out of hundreds or thousands of dollars by other users of these payment platforms [like Zelle]. ***Scammers are attracted to real-time payment platforms, in large part, because they do not need to reveal their true identity to set up an account***" (emphasis added).

24.     As a result, crooks are using Zelle and other apps to rob consumers when listing fake puppies to sell, advertising phony apartments or homes to rent, threatening utility service cut-off without immediate transfer of money, or offering extra income from wrapping a personal car in an ad.

25.     A common version of the utility scam involves fraudsters, posing as utility company employees, initially contacting customers via text message, then by phone call and asking them to make missed payments via Zelle.

26.     Another common scam: a prospective buyer supposedly wants to buy an item listed on Facebook Marketplace but then claims that the seller needs  to upgrade his Zelle app to accept money from their "business account" for the big-ticket purchase to go through, according to a June, 2022 alert by the Better Business Bureau. The scammer supposedly puts up $300 and sends you screenshots of his Zelle app as proof. Then, the scammer pressures you into paying him back.[5]

27.     Zelle is plagued with fraud, including repeat, well-known, and common scams, such as the ones mentioned above, that Navy Federal was aware of but never warned its customers about.

---

[5] Better Business Bureau, *BBB Scam Alert: Crafty New Scam Targeting Facebook Marketplace Sellers* (June 24, 2022), https://www.bbb.org/article/scams/27212-scam-alert-how-to-spot-shady-buyerson-facebook-marketplace (last accessed November 21, 2022)

28.     "Scammers go where it's easy to get the money. Zelle is their current mechanism to drain consumer accounts," warned Ed Mierzwinski, PIRG Education Fund's senior director of federal consumer programs. "The scammers are taking advantage of consumers because the banks are letting them," Mierzwinski said. "My basic advice is don't use these apps."[6]

29.     The unique, misrepresented, and undisclosed architecture of the Zelle payment system and Navy Federal's own fraud policies means—unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

30.     Banks and credit unions have a huge financial incentive to offer customers Zelle as part of their wider suite of banking services. Indeed, Early Warning Services (which operates Zelle) pitches Zelle to financial institutions with data claiming that "customers using Zelle are more profitable and stay with the financial institution longer."[7]

31.     Zelle saves money for banks and credit unions as they spend less in other transaction costs, for example, on stocking ATMs with cash, as the head of Enterprise Payments at a national bank noted about Zelle.[8]

32.     Zelle also saves participating financial institutions money by minimizing the fees the banks and credit unions are charged for competitor digital payment apps and helps reduce other costly physical services like paper checks.

---

[6] *DTE impersonators drained Rochester Hills woman's checking account using Zelle app*, Detroit Free Press (June 30, 2022), https://www.freep.com/story/money/personal-finance/susan-tompor/2022/06/30/utility-shutoff-scam-stole-cash-via-zelle/7714138001/ (last accessed September 7, 2022).

[7] *Zelle® Closes 2020 with Record $307 Billion Sent on 1.2 Billion Transactions*, (March 19, 2021) https://www.zellepay.com/press-releases/zeller-closes-2020-record-307-billion-sent-12-billion-transactions (last accessed February 6, 2022).

[8] *What's Zelle? Banks hope commercials get customers to notice the app*, Reuters, (January 29, 2018) https://www.reuters.com/article/us-usa-banks-payments-zelle/whats-zelle-banks-hope-commercials-get-customers-to-notice-the-app-idUSKBN1FI0GB (last visited February 6, 2023).

33.   Banks and credit unions also viewed Zelle as an entry point to drive members to their mobile app to maintain a central role in their financial lives.

34.   Ultimately, financial institutions offer Zelle to attract and retain customers, and when their customers use it, banks and credit unions like Navy Federal profit.

### NAVY FEDERAL'S FALSE AND MISLEADING ZELLE MARKETING AND DECEPTIVE SIGN-UP PROCESS EXPLOITED ACCOUNTHOLDERS' TRUST AND LURED ACCOUNTHOLDERS TO SIGN UP FOR AND USE ZELLE

*Mass Marketing*

35.   Zelle was introduced to the American public with a massive advertising blitz starting in 2018. Navy Federal and partner financial institutions marketed Zelle as a safer alternative to other instant payment apps and other payment methods "because it's backed by the banks."

36.   Marketing for Zelle is jointly designed and promulgated by Zelle and member banks. The advertisements exploit accountholders' existing trust in their financial institutions and focus on reinforcing that it's a trusted bank-backed app: "We do our own campaigns and we also work closely with banks and credit unions to give them materials and messaging to reach their customers." Stated Melissa Lowry, Vice-President of Marketing and Branding at Early Warning Services,  "***People can hear about Zelle from their banks and credit unions that they already know and trust***."[9]

37.   Navy Federal and Zelle leveraged consumer trust of their existing financial institution to attract users: "Trust is at the heart of the consumer payment relationship," said Ravi Loganathan, Head of Business Intelligence at Early Warning Services. "Our research showed that new segments of consumers engaged in a P2P payment for the

---

[9] *Zelle's Melissa Lowery: 'Beyond awareness, we're trying to show how we make everday better,'* Tear Sheet (March 21, 2019), https://tearsheet.co/podcasts/zelles-melissa-lowry-beyond-awareness-were-trying-to-show-how-we-make-everyday-better (last accessed February 16, 2023).

first time because it was offered from their known and trusted mobile banking environment[.]"[10]

38.     Whether the consumer wants it or not, Zelle comes integrated into Navy Federal's app and online banking website, unlike other peer-to-peer payment apps which require downloading a third-party app.

39.     Moreover, Navy Federal's embedding of Zelle into its mobile app and website deceives consumers into perceiving Zelle as an extension of their traditional banking services: "In our research, we learned that people who are peer-to-peer skeptics are those resistant to using something outside traditional banking," said Rose Corvo, Chief Administrative Officer for Early Warning. "The fact that they have it in their banking app — that gets through the safety barriers in mind."

40.     In other words, Zelle and Navy Federal marketed Zelle with a fundamental pitch: we are your trusted financial institution, and we would not offer you a product that was not as "safe" as other products offered by Navy Federal.

41.     Aggressive marketing touted Zelle's bank-backed safety and security. In one TV commercial that aired in January 2018, performer Daveed Diggs from the Broadway show Hamilton rapped, "You can send money safely cause that's what it's for / It's backed by the banks so you know it's secure."

42.     Plaintiff recalls viewing this advertisement and understood the promise of "safety" and "backed by the banks" to refer to fraud and dispute resolution protection as existed with other Navy Federal payment methods like debit cards and credit cards.

43.     The general public and its leaders also reasonable understood the Zelle "safety" promises to refer to fraud protection. As Senator Elizabeth Warren said to CEOs of some of the banks that own Zelle, during a Senate Banking Committee hearing in September 2022: "Zelle is not safe. You built the system, you profit from every

---

[10] *Zelle® Study Finds Growing Use of Digital Payments Across Generations* (July 11, 2018), https://www.zellepay.com/press-releases/zelle-study-finds-growing-use-of-digital-payments-across-generations (last accessed February 16,  2023).

transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem."

*Marketing During the Use of the Navy Federal App and Website and During Zelle Sign-up*

44.    Accountholders sign up for Zelle after they have already become Navy Federal accountholders—often, years later.

45.    Navy Federal's mobile app and online banking website feature numerous invitations and advertisements to sign up for and use the Zelle service.

46.    In its marketing about Zelle and during the Zelle signup process within the Credit Union's mobile app and website, Navy Federal makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

47.    It also promises: "Move money in the moment.  Simply and **Securely** – with lots of people you know" (emphasis added).

48.    Plaintiff recalls viewing both these statements prior to signing up for and using Zelle and understood them to refer to fraud and dispute resolution protection as existed with other Navy Federal payment methods like debit cards and credit cards.

49.    At no time in its marketing or during the sign-up process does Navy Federal warn potential users of the true security risks of using the Zelle service—including the immediate and acute risk of fraud, the dangerous architecture of the system (described above) and the risk that fraudulent losses will never be reimbursed by Navy Federal, and the risk that Zelle debit card transactions are much less safe than other payment methods offered by Navy Federal.

50.    Navy Federal misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. *Had Plaintiff been adequately informed of these risks, she would not have signed up for or used Zelle.*

51.    Navy Federal's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead

luring accountholders to sign up for and use the service with promises of ease, safety and security.

52.   These representations—which all users view, including Plaintiff, during the sign-up process—are false and contain material omissions.

53.   Navy Federal misrepresents the true nature, benefits and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would not have used Zelle if she had been adequately informed of the risks.

54.   Navy Federal's misrepresentations and omissions are especially pernicious because Navy Federal alone knows material facts regarding Zelle—including rampant fraud, thee fact that fraud-induced Zelle transfers will almost never be reimbursed to accountholders, and the fact that Zelle debit card transactions are verifiably less protected and less safe than other payment methods offered by the credit union. Navy Federal intentionally concealed those dangers and risks from Plaintiff and Class members to induce them into signing-up for and using Zelle.

**NAVY FEDERAL HAS IGNORED REGULATORY GUIDANCE**

55.   Navy Federal refuses to help when consumers send money to the wrong person or the wrong account whether it was an accident or because they were tricked into making the transfer.

56.   Erroneous Electronic Fund Transfers ("EFT") are easy to make with Zelle – a service that prioritizes convenience and speed over safety and security, despite its marketing promises.

57.   Regulation E imposes the duty to investigate and resolve "errors" which includes "an incorrect electronic fund transfer to or from the consumers account." 12 C.F.R. § 1005.11(a)(1)(ii).

58.   Nothing in the EFTA excludes consumer errors. *See id.*, (a)(2) (excluding as "error" a routine inquiry about the consumer's account balance, a request for

information for tax or recordkeeping purposes, or a request for duplicate copies of documentation).

59.    Errors are easy to make with Zelle when all that's needed to send money is nothing more than an email or phone number.

60.    Despite Navy Federal's duty to investigate and resolve "errors," Navy Federal has failed to do so leaving Plaintiff and Class Members on the hook for hundreds or even thousands of dollars.

61.    On information and belief, Navy Federal does not reimburse consumers for losses from incorrect EFTs, even where the losses are timely reported by consumers.

**NAVY FEDERAL BREACHES CONTRACT PROMISES THAT DEBIT CARD-LINKED ZELLE TRANSACTIONS COME WITH ZERO FRAUD LIABILITY AND THE SAME PROTECTIONS AS OTHER DEBIT CARD TRANSACTIONS, INCLUDING A ROBUST DISPUTE RESOLUTION PROCESS**

62.    In addition to marketing promises, Navy Federal makes strong contract promises that Zelle transactions processed as debit card transactions will come with robust fraud and dispute resolution protections.

63.    For all accountholders like Plaintiff with an active debit card, Navy Federal processes Zelle transactions as a debit card transaction.

64.    Navy Federal expressly promises accountholders as much in the Zelle Agreement, attached hereto as **Exhibit 1**:

> This Agreement includes, and your use of the Zelle and Other Payment Services is subject to, the terms of the Important Disclosures (NFCU 606); Mobile Banking, Online Banking, and Bill Pay Terms and Conditions (NFCU 652A); and Debit Card Disclosure (NFCU 210AB) that apply to your use of the Zelle and Other Payment Services and the portion of the Site through which the Zelle and Other Payment Services are offered.

> By providing us with names, mobile phone numbers, and/or email addresses of recipients to whom you wish to send a payment, you authorize us to initiate a payment through the Zelle Payment Service. When we initiate a payment on your behalf, you authorize us to debit your Eligible

Transaction Account for the amount of any such payment and to send funds to the Eligible Person's financial institution. If you have an activated Navy Federal Debit Card, your payment will be processed as a debit card transaction. If you do not have an activated Navy Federal Debit Card, your payment will be sent as an ACH transaction.

Zelle Agreement at 8.

65.     Navy Federal therefore reasonably promised that Zelle transactions processed as debit card transactions would receive the same fraud and dispute resolution protections as all other debit card transactions. Indeed, neither the Zelle Agreement nor the Debit Card Agreement exclude Zelle transactions processed as debit card transactions from the normal protections afforded all debit card transactions.

66.     Debit card transactions at Navy Federal, as with all other banks and credit unions, come with extensive fraud and dispute resolution protections.

67.     The Debit Card Disclosure in effect at the time of Plaintiff's alleged Zelle transactions, attached as **Exhibit 2**, makes a simple, straightforward "Zero Liability" promise for debit card transactions: "Navy Federal's Zero Liability Policy for Fraud: [I]f you notify us of suspected fraud within 60 days of the statement date on which the fraudulent transactions first appear, *we will not hold you responsible for confirmed fraudulent transactions.*" Debit Card Disclosure at para. 15 (emphasis added).

68.     Navy Federal, however, never provided "Zero Liability for Fraud" protections to Zelle debit card transactions, despite the fact that Plaintiff promptly notified Navy Federal that she had been defrauded and that she "suspected fraud."

69.     Separately, the Debit Card Agreement in effect at the time of Plaintiff's alleged Zelle transactions also promises a robust resolution process for debit card transactions that the accountholder "disputes":

Disputed transactions that are not covered by our Error Resolution Process such as defective, damaged, or non-receipt of merchandise or services, or items received "not as described" will be handled at our discretion. Please

first make a good faith attempt to resolve discrepancies with the merchant. If your good faith attempt is not successful, we may use our dispute resolution process to act on your behalf and pursue recovery of funds from the merchant, based on your statement supporting your claim, as well as any documentation we may request. We may not be able to recover your funds. We will report the results of the dispute resolution process to you within 120 days; however, we are not obligated to issue a Provisional Credit during the dispute resolution process.

*Id.*, at para. 17.

70.    The Debit Card Agreement in effect prior to the 2021 update never stated that Zelle transactions were <u>not</u> eligible for Zero Fraud Liability protection, purchase protection or the dispute resolution process.

71.    These provisions are and were reasonably understood by Plaintiff to mean that Zelle transfers effectuated via a Navy Federal debit card would be treated in the same manner as all other debit card transactions, with the same protections and same resolution process procedures.

72.    In addition to its promises of Zero Fraud Liability for debit card purchases, Navy Federal also offers a robust dispute resolution and chargeback process for debit card purchases. But it fails to provide that dispute resolution and chargeback process for debit card-linked Zelle transactions.

73.    Because Navy Federal's contract expressly states that Zelle transactions will be processed as debit card transactions (as described above), Navy Federal reasonably promised to treat disputed Zelle transactions made via debit card in the same manner as other debit card transactions.

74.    Plaintiff reasonably believed, therefore, that debit card-linked Zelle transactions would provide her with the same protections as Navy Federal provides for other debit card transactions. Those fraud and dispute protections for all other debit card transactions are robust.

75.    Navy Federal, like all banks and credit unions, offers a robust dispute resolution

and "chargeback" process for debit card and credit card purchases. It works like this: a cardholder contacts their bank or credit union to dispute a transaction, claiming that it resulted from fraud or abuse. The bank or credit union then pulls the funds from the merchant's account, and returns them to the cardholder's account, or otherwise refunds the accountholder.

76.     In short, a debit card chargeback is a debit card charge that has been reversed by a bank or credit union. Chargebacks offer a critical layer of consumer protection, ensuring consumer confidence in payment card technology.

77.     Navy Federal routinely "charges back" debit card transactions disputed by accountholders, for any number of reasons, including shoddy or missing merchandise. With respect to debit card transactions, Navy Federal's policy and practice is to allow consumers to dispute debit card transactions for numerous reasons.

78.     In fact, Navy Federal goes to great lengths to recover their customers' money, or reimburse them for the loss even where recovery is impossible, for disputed debit card transactions.

79.     As part of this process, any Navy Federal member can dispute a debit card purchase. Once a member notifies Navy Federal of a problem with a debit card transaction, the credit union produces and provides the Form NFCU 628a for accountholders to lodge a dispute, attached hereto as **Exhibit 3**.

80.     As a reason for a debit card charge dispute, Form NFCU 628a allows accountholders to select from numerous options including, "Cancellation," "Returned Merchandise," "Non-Receipt of Goods or Services," and "Quality of Services or Goods."

81.     The dispute options, therefore, cover circumstances in which an accountholder makes a purchase, but did not receive what was bargained for.

82.     Upon information and belief, Navy Federal automatically issues provisional credits and affirms those provisional credits <u>for virtually all debit card transactions disputed by accountholders</u>. It does this routinely and as a matter of policy.

83.   There is, however, one major exception that exists as a result of a secret policy adopted by Navy Federal: the credit union refuses to issue provisional credits for Zelle debit card transactions.

84.   Without ever informing accountholders, Navy Federal also excludes Zelle debit card transactions from the debit card dispute resolution process altogether.

85.   Navy Federal never offered or provided a Form NFCU 628a for Plaintiff to fill out when she disputed her Zelle debit card transaction. In fact, as explained below, it immediately informed Plaintiff that any dispute claim would be rejected, it never asked for support or for documentation, never performed any investigation, and never made any attempt to recover her stolen money.

86.   Despite contractual promises to the contrary (including the implied covenant of good faith and fair dealing), Navy Federal completely failed to provide Zelle debit card transactions the same protections and dispute resolution as all other debit card transactions.

87.   Nor did Navy Federal ever warn that debit card-linked Zelle transactions would be underlined excluded from debit card protections offered on all other purchases.

88.   Indeed, not until late 2021 did Navy Federal ever even attempt to state in the Debit Card Agreement what had been the truth all along: it had a corporate policy of excluding Zelle debit card purchases from the dispute resolution process all along.

89.   In late 2021, Navy Federal added a single paragraph to its Debit Card Agreement stating:

> Transaction(s) conducted through a person-to-person payment service provider that transfers funds, such as the Zelle® network and Cash App, is intended for use among friends and family. There are no protections or warranties for the purchase of goods and services. Navy Federal is unable to pursue these merchants or the 3rd party recipient for recovery on your behalf through the dispute process.

90.   This late attempt to quietly add an exclusion for Zelle debit card purchases

confirms that even Navy Federal believed prior versions of the Debit Card Agreement never contained such an exclusion.

91.    Moreover, Navy Federal did not reasonably notify existing accountholders of this material change to the Debit Card Agreement in late 2021. It therefore did not become effective for any existing Navy Federal accountholder.

92.    Additionally, the Zelle Agreement also promises that Navy Federal will take active steps to detect and prevent fraud, which it failed to do: "the [Zelle] transfer may be blocked to prevent fraud or comply with regulatory requirements. If we delay or block a payment that you have initiated, we will notify you by email or text message and may request you or the recipient to take additional action." *Zelle Agreement* at 10.

93.    Navy Federal has adopted an investigations apparatus that almost always rejects valid claims, in breach of the implied covenant.

PLAINTIFF SANCHEZ'S FACTUAL ALLEGATIONS

94.    When Plaintiff Sanchez signed up for Zelle she was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by Navy Federal.

95.    For example, on or about April and May, 2022, Plaintiff used her Navy Federal debit card to transfer approximately $3,500 from Plaintiff's personal bank account using the Zelle service.

96.    Plaintiff was seeking employment opportunities online.

97.    While browsing LinkedIn for potential roles, Plaintiff came across a job with a company named, Appen purporting to be recruiting potential job candidates. Before submitting a job application with Appen, Plaintiff reviewed its website and LinkedIn page.

98.    Plaintiff called Appen's number on its website and spoke with its representative.

99.    After conducting two interviews with Appen, she was purportedly extended an offer of employment.

100.   The position was a remote chat customer support role. Accordingly, Plaintiff needed necessary equipment before commencing her job, such as laptops and phones.

101.   Appen informed Plaintiff that she needed to pay her work equipment and applicable shipping costs before starting her job, but assured her that Appen would reimburse her.

102.   Thus, over the span of a few weeks, Plaintiff made numerous debit-card linked Zelle transfers to Appen under the impression that she would be receiving necessary equipment for her future job.

103.   Plaintiff received doctored invoices and tracking labels from Appen.

104.   In total, Plaintiff sent more than $3,500.00 to Appen via debit-card linked Zelle transfers.

105.   However, after a few weeks, Plaintiff grew weary as she never received any of the equipment. When she began asking Appen about the status of her work equipment, Appen always had an excuse.

106.   Eventually, Plaintiff called a number from Appen she found online and spoke with representatives at the real Appen who informed her that they had not hired anyone recently and were not aware of Plaintiff's purported job offer.

107.   At this point, Plaintiff realized that she was never going to receive the equipment and that she fell victim to fraud at the hands of the purported Appen.

108.   Plaintiff timely alerted Navy Federal of the erroneous and fraudulent transfers who immediately informed Plaintiff that Navy Federal "can't do anything" to retrieve her funds, but after Plaintiff insisted, it opened up a fraud claim on her behalf and provisionally credited her account for the fraudulent Zelle transfers.

109.   Navy Federal refused to reimburse her for the losses, refused to treat her Zelle debit card transaction like every other disputed debit card transaction, and even refused to conduct a reasonable investigation or attempt to recoup her money.

110.   Navy Federal never offered or provided a Form NFCU 628a for Plaintiff to report the disputed Zelle transactions.

111. For weeks, Plaintiff repeatedly requested updates and information regarding her claim and Navy Federal's investigation, but Navy Federal failed to update Plaintiff.

112. Indeed, after about four months, Plaintiff received a text message alert that her account was over drafted. When she reviewed her account balance, she noticed that Navy Federal debited all the Zelle transactions she disputed from her account, reversing the provisional credits she had received.

113. On September 7, 2022, Navy Federal communicated the denial to Plaintiff by letter, which stated in relevant part that: "Based on a thorough investigation of your account activity, we have determined that no error has occurred." Navy Federal failed to provide the evidence it relied upon to reach its conclusions and failed to explain the reasoning behind this conclusory statement.

114. Without providing any details of its "thorough investigation", the Credit Union denied Plaintiff's claim and reversed the provisional credits on her account causing Plaintiff's account to overdraft.

115. Navy Federal informed Plaintiff that it could not return her funds and informed her that it denied her claim.

## CLASS ALLEGATIONS

116. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated, on behalf of the below-defined Classes:

> All persons who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "Nationwide Class")

> All persons in California who: a) had a bank account with Navy Federal and were induced via fraud to perform a Zelle transfer; b) alerted Navy Federal of the fraudulent transfer within 60 days; and c) did not have the fraudulent transfer amount(s) credited by Navy Federal (the "California Class")

117. Excluded from the Classes are Navy Federal's officers, directors, and employees; any entity in which Navy Federal has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Navy Federal. Further excluded from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

118. **Numerosity**: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals.

119. **Commonality**: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

     a.    Whether Plaintiff and the Class Members lost money that was transferred from their account via Zelle;

     b.    Whether Plaintiff and the Class Members were customers of Navy Federal at the time they lost money;

     c.    Whether Navy Federal violated EFTA by failing to adequately investigate the disputes of Plaintiff and the Class Members;

     d.    Whether Navy Federal violated EFTA by failing to correct errors on the accounts of Plaintiff and the Class Members within 45 days of the transaction being disputed;

     e.    Whether Plaintiff and the Class Members are entitled to maximum statutory damages, costs, and fees under EFTA;

     f.    Whether Navy Federal's conduct was "unlawful" as that term is defined in the UCL;

     g.    Whether Navy Federal's conduct was "unfair" as that term is defined in the UCL;

h.     Whether Navy Federal have been conferred an enrichment by keeping funds that they were obligated to replace pursuant to Regulation E's error resolution obligations;

i.     Whether Navy Federal breached its contract; and

j.     Whether Plaintiff and the Classes are entitled to injunctive relief.

120.   **Typicality**: Plaintiff's claims are typical of those of other Class Members because Plaintiff was a victim of the Zelle scam by a third party who caused a withdrawal of funds from her Navy Federal account to occur through the Navy Federal/Zelle mobile application, after disputing that Zelle transaction, Plaintiff was informed by Navy Federal that the Zelle transaction would ultimately not be reversed.

121.   **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's Counsel are competent and experienced in litigating consumer class actions.

122.   **Predominance**: Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Navy Federal's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

123.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members,

which would establish incompatible standards of conduct for Navy Federal. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

124.   Navy Federal has acted on grounds that apply generally to the Classes, so that class certification is appropriate.

125.   All Members of the proposed Classes are readily ascertainable. Navy Federal has access to consumer reporting of fraudulent and/or unauthorized transactions on their books and records. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

126.   **The Proposed Class Satisfies the Prerequisites for Injunctive Relief**. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class a as a whole. Plaintiff remains interested in using Zelle to transfer account funds in the future; there is no way for Plaintiff and the Class to know when or if Defendant will cease deceptively misrepresenting the true risks of the Zelle service.

127.   Specifically, Defendant should be ordered to (1) provide customers with sufficient, prominent disclosures regarding fraud, common scams, and its policies regarding reimbursement of fraudulent transfers *prior* to their decision to sign up for and use Zelle; and (2) if a consumer reports an error related to an EFT and Navy Federal determines no error occurred, it should be required to provide a report of the results of their findings with a detailed, written explanation for their determination that complies with Regulation E's procedures for resolving errors.

128.   **Notice**: Plaintiff anticipates providing direct notice to the Class for purposes of class certification, via U.S. Mail and/or email, based upon Navy Federal's and/or Navy Federal's agents' records.

## FIRST CAUSE OF ACTION
### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

**(On Behalf of Plaintiff and the Classes)**

129.    Plaintiff Sanchez realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further allege as follows:

130.    The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

131.    The UCL imposes strict liability. Plaintiff need not prove that Navy Federal intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Deceptive" Prong*

132.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

133.    Navy Federal's practices, as described herein, constitute "fraudulent" business practices in violation of the UCL because, among other things, Navy Federal's marketing regarding Zelle indicates the Bank will protect against fraudulent losses incurred using the Zelle service. Moreover, Navy Federal concealed the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by Navy Federal as a matter of uniform policy, is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

### *"Unfair" Prong*

134.    A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

135.    Navy Federal's actions constitute "unfair" business practices because, as alleged above, it declined to reverse fraudulent charges on the accounts of Plaintiff and Class

Members, despite marketing representations, contract promises, and statutory obligations pursuant to EFTA.

136.   The harm to Plaintiff and Class Members grossly outweighs the utility of Navy Federal's practices as there is no utility to practices of Navy Federal.

### *"Unlawful" Prong*

137.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

138.   Navy Federal's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of EFTA as described in Plaintiff's Sixth Cause of Action below.

139.   The violation of any law constitutes as "unlawful" business practice under the UCL.

140.   These acts and practices alleged were intended to or did result in violations of EFTA.

141.   Navy Federal has and will continue to unlawfully deny the transaction disputes of Plaintiff, the Classes, and the public by claiming that said disputed transactions are "authorized," even though said transactions are actually "unauthorized," as that term is defined by EFTA and applicable regulations. Consequently, the practices of Navy Federal constitute unfair and unlawful business practices within the meaning of the UCL.

142.   Pursuant to the UCL, Plaintiff and the Classes are entitled to preliminary and permanent injunctive relief and order Navy Federal to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Classes of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

143.   Pursuant to the UCL, Plaintiff and the Classes are entitled to preliminary and permanent injunctive relief and an order requiring Navy Federal to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the

Classes of all revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

## SECOND CAUSE OF ACTION
**Violation of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(Asserted on Behalf of Plaintiff and the Classes)**

144.   Plaintiff repeats and realleges the above allegations as if fully set forth herein.

145.   California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with  intent … to dispose  of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

146.   Navy Federal's material misrepresentations and omissions alleged herein violate Bus. & Prof. Code § 17500.

147.   Navy Federal knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

148.   Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff and Class Members, on behalf of the general public, seeks an order of this Court enjoining Navy Federal from continuing to engage, use, or employ their practice of misrepresenting the Zelle service.

149.   Further, Plaintiff and Class Members seek an order requiring Navy Federal to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Navy Federal by means of said misrepresentations.

150.   Additionally, Plaintiff and the Classes seek an order requiring Navy Federal to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

**THIRD CAUSE OF ACTION**
**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of the Plaintiff and the Classes)**

151.   Plaintiff repeats and realleges the above allegations as if fully set forth herein.

152.   Plaintiff and members of the Class contracted with Navy Federal for checking account services, as embodied in the Deposit Agreement & Disclosures.

153.   Navy Federal breached the terms of its contract with consumers when as described herein, Navy Federal failed to fairly investigate reported erroneous and fraudulent transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud losses incurred on debit-card linked Zelle transactions.

154.   Further, under the law of each of the states where Navy Federal does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Navy Federal's discretion to abuse self-granted contractual powers.

155.   This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

156.   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

157.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect

1   performance, abuse of a power to specify terms, and interference with or failure to

2   cooperate in the other party's performance.

3   158.   Navy Federal breached the covenant of good faith and fair dealing when it failed

4   to fairly investigate reported erroneous and fraudulent transactions on the Zelle money

5   transfer service, failed to reimburse accountholders for fraudulent losses incurred on

6   debit-card linked Zelle transactions.

7   159.   Each of Navy Federal's actions were done in bad faith and was arbitrary and

8   capricious.

9   160.   Plaintiff and members of the Classes have performed all of the obligations

10  imposed on them under the contract.

11  161.   Plaintiff and members of the Classes have sustained monetary damages as a

12  result of Navy Federal's breaches of the contract and covenant of good faith and fair

13  dealing.

14

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Classes)**

15

16  162.   Plaintiff realleges and incorporates herein by reference the allegations contained

17  in all preceding paragraphs, and further alleges as follows:

18  163.   Navy Federal  owed Plaintiff and the Classes at least a duty to take reasonable

19  steps to safeguard their financial information and protect their financial accounts from

20  malicious third parties, to adequately warn of known risks and/or dangers associated

21  with the Zelle mobile application, and to properly investigate disputed transaction

22  initiated and consummated through the Navy Federal and/or Zelle app.

23  164.   Zelle owed Plaintiff and the Classes at least a duty to take reasonable steps to

24  adequately warn of known risks and/or dangers associated with the Navy Federal/Zelle

25  app, and to take appropriate steps in response to a known scams involving the app to

26  protect consumers from malicious third parties.

27  165.   Navy Federal breached its obligations to Plaintiff and Class Members and was

28  otherwise negligent and/or reckless by at least:

a.   Failing to maintain adequate data security measures to prevent or reduce the risk of disclosure of the names, phone numbers, and bank affiliation of Plaintiff and the Class to malicious third parties;

b.   Failing to adequately protect the private information of Plaintiff and the Class;

c.   Failing to properly warn Plaintiff and the Class of the risks and/or dangers associated with the Navy Federal/Zelle mobile app or informing consumers about the Zelle-related scams;

d.   Failing to adequately investigate and document findings from the investigations of fraud-related EFT disputes of the unauthorized transactions made on the accounts of Plaintiff and the Class using the Navy Federal/Zelle payment platform.

e.   Failing to take appropriate steps to avoid unauthorized transactions through the Navy Federal/Zelle mobile application in response to known scams and continuing with business as normal;

f.   Failing to implement appropriate and sufficient safeguards against scams of the nature alleged in the Complaint in light of the knowledge that those scams have been rampant across the country;

g.   Failing to review account agreements and disclosures to ensure they do not attempt to diminish or limit consumers' rights under Regulation E;

h.   Permitting scammers to use Zelle's member banks to siphon funds from Plaintiff's and Class Members' accounts using the Navy Federal/Zelle payment platform;

i.   Failing to reverse unauthorized transactions pursuant to Regulation E error resolution requirements following disputes of Plaintiff and the Class despite Navy Federal's knowledge that said transactions were unauthorized as part of a scam that is well-known to Navy Federal; and

j.      Failing to permanently reverse unauthorized transactions upon a sufficient showing by Plaintiff and the Class that said transactions were unauthorized.

166.   As a direct and proximate result of Navy Federal's breach, Plaintiff and Class Members lost funds from their Navy Federal bank accounts.

167.   Plaintiff and Class Members are entitled to damages for their continuing and increased risk of fraud and their loss of money.

### FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Classes)

168.   Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

169.   Navy Federal has been conferred the benefit or enrichment by keeping funds that they are otherwise obligated to replace for Plaintiff and Class Members pursuant to Regulation E's error resolution obligations.

170.   Navy Federal knew and appreciated this benefit or enrichment and the detriment or impoverishment to Plaintiff and Class Members.

171.   It is inequitable for Navy Federal to retain the benefit or enrichment of keeping these funds when they know that, as financial institutions, they are obligated to comply with Regulation E and credit Plaintiff and putative Class Members' accounts for the amounts taken.

172.   Plaintiff and Class Members have sustained a detriment or an impoverishment from Navy Federal's failure to remedy this inequity and are entitled to restitution for the unjust enrichment to Navy Federal.

173.   Plaintiff and Class Members are entitled to restitution and disgorgement of the funds unjustly retained by Navy Federal in the absence of any legal relief.

### SIXTH CAUSE OF ACTION
### VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT ("EFTA", 15 U.S.C. §§ 1693, *ET SEQ.*

**(On Behalf of Plaintiff and the Classes)**

174.   Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

175.   The Electronic Fund Transfer Act ("EFTA") and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(a).

176.   The primary objective of EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

177.   Financial institutions have error resolution obligations pursuant to Regulation E in the event that a consumer notifies the financial institution of an error. 12 C.F.R. § 1005.11.

178.   Navy Federal is a financial institution. 12 C.F.R. § 1005.2(i).

179.   "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C. § 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

180.   A financial institution's "review of its own records regarding an alleged error" satisfies § 1693f's investigation requirement if "(i) [t]he alleged error concerns a transfer to or from a third party; and (ii) [t]here is no agreement between the institution and the third party for the type of electronic fund transfer involved." 12 C.F.R. § 205.11(c).

181.   The Official Interpretation explains further that a financial institution "must review any relevant information within the institution's own records for the particular account to resolve the consumer's claim." 12 C.F.R. § 205, Supp. I. at 11(c)(4).

182.   But "a financial institution may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim." *Id.*

183.   After said investigation, the financial institution must determine whether an error has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

184.   A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) days after receipt of notice of error to investigate. *Id.* § 1693f(c).

185.   Pursuant to the EFTA, an error includes "an incorrect electronic fund transfer to or from the consumer's account." *Id.* § 1693f(f).

186.   An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any P2P or mobile payment transactions that meet the definition of EFT. 12 C.R.F. 1005.3(b)(1)(v); *id.*, Comment 3(b)(1)-1ii.

187.   Here, Plaintiff and Members of the Classes made incorrect electronic fund transfers from their Navy Federal accounts to third-party fraudsters.

188.   After the incorrect EFTs were made, the EFTs appeared on the bank statements of Plaintiff and Class Members.

189.   Plaintiff and Class Members notified Navy Federal of these errors within sixty (60) days of their appearances on the accounts of Plaintiff and other Class Members.

CLASS ACTION COMPLAINT                                    30

190.   After receiving notice of the incorrect EFTs on Plaintiff's and other Class Members' accounts, Navy Federal erroneously concluded that that the incorrect EFTs were not erroneous.

191.   As a direct and proximate result of the conduct of Navy Federal, Plaintiff and other Class Members were unable to reclaim funds that were incorrect and fraudulently taken from their accounts with Navy Federal within the authorized period for error resolution.

192.   Upon information and belief, Navy Federal knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiff and other Class members were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

193.   Upon information and belief, Navy Federal intentionally determined that the unwanted transfer of funds via Zelle on accounts of Plaintiff and Class Members were not in error due to, at least in part, Navy Federal's financial self-interest as a member-bank of Zelle, and to avoid its liability to Plaintiff and other Class members for the incorrect transfers pursuant to Regulation E.

194.   Navy Federal refused to reverse or refund funds to Plaintiff and Class members.

195.   As such, Plaintiff and Class Members are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Navy Federal; and (iii) reasonable attorneys' fees and costs. *Id.* §§ 1693f(e)(2), 1693m(a)(2)(B)-(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Navy Federal as follows:

- Class certification of this action;
- Appointment of Plaintiff as Class Representative;
- Appointment of Plaintiff's attorneys as Class Counsel;

- An award of actual damages, in an amount to be determined at trial;

- An award of treble damages pursuant to the EFTA;

- An award of the lesser of $500,000.00 or one percent (1%) of the net worth of Navy Federal;

- Injunctive and other equitable relief against Navy Federal as necessary to protect the interests of Plaintiff and other Class Members, and an order prohibiting Navy Federal from engaging in unlawful and/or unfair acts described above, including public injunctive relief;

- Disgorgement;

- An order of restitution from Navy Federal for unjust enrichment;

- An order declaring Navy Federal's conduct as unlawful;

- Costs of Suit;

- Pre- and post-judgment interest;

- An award of reasonable attorneys' fees; and

- Any other relief the Court may deem just and proper, including interest.

### DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: February 21, 2023

**EDELSBERG LAW, PA.**

*/S/ Scott Edelsberg*

Scott Edelsberg (330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067

Jeffrey D. Kaliel
*jkaliel@kalielpllc.com*
Sophia Goren Gold
*sgold@kalielgold.com*
**KALIELGOLD PLLC**
1100 15the Street NW, 4th Floor
Washington, D.C. 20005

Counsel for Plaintiff